UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

ANCILE INVESTMENT COMPANY
LIMITED,

                Plaintiff,

     -against-                            08 CV 9492 (KMW)

ARCHER DANIELS MIDLAND COMPANY,         OPINION AND ORDER

                Defendant.

---------------------------------------------------------X

WOOD, U.S.D.J.:

      Plaintiff, Ancile Investment Company Limited ("Plaintiff"), brings this action against

Archer Daniels Midland Company ("Defendant"), alleging one claim under the laws of Brazil,

and claims under New York state law for (1) breach of duty of bailment; (2) breach of contract;

and (3) conversion. Plaintiff's claims are based on Defendant's alleged failure to endorse and

deliver certain bills of lading in connection with Plaintiff's financing of sales of fertilizer

materials shipped to Brazil.

      Defendant moves to dismiss the three claims under New York law pursuant to Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted.

      For the reasons stated below, the Court GRANTS Defendant's motion to dismiss

Plaintiff's New York claims.

**I.**    <u>**Background**</u>

      The following facts are drawn from Plaintiff's Complaint, and are taken as true for the

purposes of Defendant's Rule 12(b)(6) motion. *See Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 555 (2007).

A.    **Parties**

    1.    **Plaintiff**

Plaintiff is a foreign corporation organized and operating under the laws of the Cayman Islands, with its principal place of business in the Cayman Islands. Plaintiff entered into a Credit Facility Agreement with non-party, Solo Vivo Industria E Commercio De Fertilizantes LTDA ("Solo Vivo") under which Plaintiff agreed to make short term loans to Solo Vivo for the purpose of financing Solo Vivo's import and export of goods by ocean vessels. *See* Amended Complaint (hereinafter "Compl.") ¶¶ 7-8.

    2.    **Defendant**

Defendant is a domestic corporation organized under the laws of the State of Delaware. Defendant maintains places of business within the Southern District of New York. Defendant entered into a series of contracts with Solo Vivo (hereinafter the "Fertilizer Contracts") to sell to Solo Vivo certain raw materials for the purpose of manufacturing fertilizer. Compl. ¶¶ 14, 23, 33. These transactions were financed by Plaintiff. *Id*. ¶¶ 15, 24, 38.

B.    **Facts**

Plaintiff's Complaint boils down to the following basic allegation: In exchange for Plaintiff's financing of Solo Vivo's purchases of fertilizer materials from Defendant, Solo Vivo "instructed" Defendant to deliver to Plaintiff the bills of lading for each shipment of goods as security for the financing.[1] Those bills of lading served as the documents of title to the goods

---

[1] "A bill of lading is simply an acknowledgment by a carrier that it has received the goods for shipment. Second, it is a contract of carriage; third, if the bill is negotiated, it controls possession of the goods and is one of the indispensible documents in financing the movement of commodities and merchandise." *Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc*., 612 F.3d 138, 141 n.3 (2d Cir. 2010) (quoting 1-2 Saul Sorkin, Goods in Transit § 2.01). In this case, the bills of lading at issue were consigned "To the Order of Archer Daniels Midland Co." *See* Affidavit of David M. Monachino in Support of Rule 12(b)(6) Motion for Partial Dismissal

shipped.  When Defendant failed to do this, and Solo Vivo defaulted on its payment obligations, Plaintiff was left unpaid, with no way to enforce its security interest in the goods.  Compl. ¶ 55.

The financing relationship between Plaintiff and Solo Vivo is set forth in a Credit Facility Agreement (hereinafter the "CFA") entered into in June 2007.  *Id*. ¶ 7. Under the terms of the CFA, Plaintiff agreed to make short-term loans to Solo Vivo to finance Solo Vivo's importation by ocean vessel of raw materials to manufacture fertilizer.  *Id.* ¶¶ 8-9.  Plaintiff agreed to advance approximately 83.33% of the invoice amounts, and Solo Vivo would be responsible for paying the remaining 16.67% on such invoices.  *Id.* ¶ 10.

Solo Vivo agreed to provide Plaintiff with security interests in the fertilizer materials pending repayment of the short-term loans.  In particular, according to the Complaint, Solo Vivo "agreed to pledge to [Plaintiff] various forms of collateral and guarantees as security . . ., including all Bills of Lading and other documents of title for the goods being financed."  *Id.* ¶ 11.

Plaintiff claims that the basic operation of the CFA in the transactions at issue in this lawsuit was informed by its "prior course of dealing" with Solo Vivo and Defendant.  *See id.* ¶¶ 14-32.  As alleged in the Complaint, this prior course of dealing was as follows.  In June 2007, Solo Vivo contracted with Defendant to purchase fertilizer materials carried on the ship *African Falcon*.  *Id.* ¶ 14.  The bill of lading for this shipment bore the designation "Bill of Lading No. 4."  *Id.*  Plaintiff agreed to finance Solo Vivo's purchase.  Solo Vivo instructed Defendant to, upon receipt of payment on the invoices from Plaintiff, endorse Bill of Lading No. 4 to the order of Plaintiff, and deliver the endorsed bill of lading to Plaintiff.  *Id.* ¶¶ 16-17.  The bill of lading would then serve as security for Plaintiff's loan.  *Id.*  Defendant amended the commercial invoice

---

of the Amended Complaint (hereinafter "Monachino Aff."), Exs. B-E.  This meant that they were negotiable documents, and therefore controlled possession of the underlying goods.

for the shipment to include identification of Plaintiff's bank account as the source for payment of the invoice.  *Id.* ¶ 19.

At the time Defendant received the instruction, Defendant had previously endorsed the originals of Bill of Lading No. 4 "in blank."  *Id.* ¶ 18.  This meant that whoever physically held the bill of lading itself had title to the goods.  Defendant delivered the blank endorsed bill of lading to its agent at the port to facilitate unloading of the ship.  *Id.*  After receiving payment from Plaintiff, Defendant delivered the blank-endorsed Bill of Lading No. 4 to Solo Vivo.  *Id.* ¶ 21.  Plaintiff's representative was informed of the transfer and so was able to immediately obtain from Solo Vivo the original counterparts of Bill of Lading No. 4, whereupon they were endorsed "to the order of Ancile Investment Company Limited."  *Id.* ¶ 22.

Also in June 2007, Solo Vivo contracted with Defendant to purchase additional fertilizer materials carried on the ship *Jullieta* under "Bill of Lading No. 1."  *Id.* ¶ 23.  The same basic pattern of events that occurred with the *African Falcon* and Bill of Lading No. 4 occurred with the *Julietta* and Bill of Lading No. 1.  *Id.* ¶¶ 23-31.

In August 2007, following the signing of the CFA, Solo Vivo contracted with Defendant for two further shipments of fertilizer materials to Brazil.  *Id.* ¶ 33.  The first was a shipment of muriate of potash, carried from Russia aboard the *Calypso*, under "Bill of Lading No. 10."  *Id.* ¶ 34.  The second was a shipment of monoammonium phosphate from China, shipped on the *Abkhazia* under "Bill of Lading No. PGU-04."  *Id.* ¶ 35.

On or about October 10, 2007, Solo Vivo signed a Letter of Undertaking (the "Letter of Undertaking") with Plaintiff, pursuant to which Solo Vivo, in exchange for financing, "agreed and undertook to notify and instruct" Defendant to endorse and deliver Bill of Lading No. 10 and Bill of Lading No. PGU-04 (the "Bills of Lading") to Plaintiff.  *Id.* ¶ 38.

4

In October 2007, pursuant to the CFA and the Letter of Undertaking, Solo Vivo instructed Defendant to deliver Bill of Lading No. 10, duly endorsed, to Plaintiff's representative in Brazil, upon Defendant's receipt of payment under the invoice for that shipment.  *Id.* ¶ 39. Plaintiff subsequently made a payment, via wire transfer, of $1,606,545.11 to a bank account of Defendant's in New York.  *Id.* ¶ 41.[2]  After receiving Plaintiff's payment, Defendant did not endorse and deliver Bill of Lading No. 10 to Plaintiff, and instead delivered the endorsed original counterparts of Bill of Lading No. 10 to Solo Vivo.  *Id.* ¶¶ 48-50.

A similar situation developed with respect to the August 2007 shipment of monoammonium phosphate under Bill of Lading No. PGU-04.  *Id.* ¶¶ 40, 44, 51-54.  In October 2007, Solo Vivo instructed Defendant to deliver Bill of Lading No. PGU-04 to Plaintiff.  *Id.* ¶ 40.  Plaintiff then paid 83.33% of the invoice amount to Defendant's bank account in New York. *Id.* ¶ 44.  Defendant, however, did not endorse Bill of Lading No. PGU-04 to Plaintiff.  *Id.* ¶ 51. Instead, Defendant permitted Solo Vivo to take possession of 3,320 of the 4000 metric tons of the monoammonium phosphate (83% of the total amount shipped).  *Id.* ¶ 52.  The remaining 680 metric tons of monoammonium phosphate were placed in a warehouse in Brazil controlled by Defendant.  *Id.* ¶ 53.

Solo Vivo subsequently sold or otherwise disposed of the goods carried under the Bills of Lading, but failed to repay Plaintiff on its loans under the CFA.  *Id.* ¶¶ 49, 52.  Because Plaintiff was not in possession of the Bills of Lading, it was not able to control the underlying goods to enforce its security interest, and was left unpaid.  *Id.* ¶ 55.

---

[2] This payment was $650,683.35 more than the 83.33% of the invoice amount Plaintiff was required to pay under the CFA, and was, in fact, more than the total invoice amount for the shipment.  *Id*. ¶¶ 41-43.  Plaintiff asked Defendant to return the excess amount, but Defendant did not refund any money to Plaintiff in connection with this invoice up to the time that Plaintiff filed the instant suit.  *Id*. ¶¶ 46-47.  The parties ultimately settled the overpayment dispute during the course of this litigation.

## C.     Procedural History

Plaintiff filed suit in November 2008, alleging eight claims: two claims under Brazilian law, and six claims under New York law.[3]  In March 2009, Defendant moved to dismiss the complaint on *forum non conveniens* grounds.  Plaintiff opposed the motion and cross-moved for summary judgment on five of its eight claims.  The Court denied both motions, with leave to renew the motion for summary judgment after the parties engaged in discovery.

After the close of discovery, Defendant moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Plaintiff opposed, and cross-moved for leave to file an amended complaint to conform the complaint to facts learned during discovery.  In the briefing on that motion, Plaintiff conceded that it had failed to state a claim for conspiracy to defraud. The Court granted Plaintiff's motion for leave to amend the complaint, and denied Defendant's motion for judgment on the pleadings as moot, with leave to renew.  On June 18, 2010, Plaintiff filed an Amended Complaint (hereinafter, the "Complaint"), alleging one claim under Brazilian law, and three claims under New York law:  breach of bailment, breach of contract, and conversion.  Defendant filed the instant motion to dismiss the New York claims on July 2, 2010.

## II.    Legal Standards

### A.     Motion to Dismiss Standard

In order to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead sufficient factual allegations "to state a claim to relief that

---

[3] The New York law claims alleged in the original complaint were:  unjust enrichment with respect to the overpaid funds, conversion with respect to the overpaid funds, bailment, breach of contract, conversion of the goods shipped under the Bills of Lading and conspiracy with Solo Vivo to defraud Plaintiff.  In December 2009, after Defendant paid Plaintiff $717,201.69 as payment for the three claims related to the alleged overpayment by Plaintiff, the parties stipulated to dismissal of the claims relating to that issue.  *See* Stipulation and Order of Partial Dismissal – Counts I, III and IV Only, December 22, 2009 (Dckt. No. 51).  At the time the original complaint was filed, the case was proceeding before Hon. Paul A. Crotty.  The case was transferred to the undersigned on September 30, 2010.

is plausible on its face." *Twombly*, 550 U.S. at 570.  A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, -- U.S. --, 129 S.Ct. 1937,

1949 (2009).  Where a plaintiff has not "nudged [his or her] claims across the line from

conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.  The

Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all

inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir.

2006) (internal quotations omitted).  On the other hand, "the tenet that a court must accept as true

all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Iqbal*, 129 S.Ct. at 1949.  *See also Twombly*, 550 U.S. at 555 (noting that a court is "not

bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v.

Allain*, 478 U.S. 265, 286 (1986)).

   Although a district court's analysis on a motion to dismiss is confined, in the first

instance, to "the allegations contained within the four corners of [the] complaint," *Pani v.

Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir.1998), a court may also examine "any

written instrument attached to [the complaint] or any statements or documents incorporated in it

by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  *See also

id.* at 153 ("Even where a document is not incorporated by reference, the court may nevertheless

consider it where the complaint 'relies heavily upon its terms and effect,' which renders the

document 'integral' to the complaint." (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel.

Co.*, 62 F.3d 69, 72 (2d Cir.1995))).[4]

---

[4] The Complaint makes reference to several agreements and documents, a number of which are
attached to Defendant's affidavit in support of its motion.  Specifically, the Complaint

**B.     Choice of Law**

At issue in the instant motion are Plaintiff's New York state law claims.  In order to evaluate these claims, the Court must identify the jurisdiction whose substantive law governs the dispute.  As a starting point, the Court applies the choice of law rules of the forum state – here, New York – to answer this question.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).  However, it is unnecessary to apply the standard choice of law analysis under New York law, because the parties have expressly consented to the application of New York law to this motion.  *See* Defendant's Memorandum of Law in Support of Defendant's Rule 12(b)(6) Motion for Partial Dismissal of the Amended Complaint at 5 n.5.  Courts in this circuit have also found implied consent to apply New York law where, as here, the parties cite only New York law in their briefs.  *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).  This express and implied consent is "sufficient to establish choice of law."  *Id.* (quoting *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.3d 239, 242 (2d Cir. 1989)).  *See also Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.") (citation omitted).  Thus, the Court will apply New York law to the motion.

**III.   Analysis**

**A.     Contract Claim**

**1.     Applicable Law**

---

incorporates by reference the following documents that are before the Court on this motion:  the Fertilizer Contracts (Monachino Aff., Exs. B-E), the bills of lading associated with each transaction (Monachino Aff., Exs. B-E), and the CFA (Monachino Aff., Ex. F).  Because the Court finds that these documents were incorporated by reference into the Complaint, the Court will consider the contents of those documents to the extent relevant to the disposition of this motion.

Under New York law, to make a claim for breach of contract, a plaintiff must allege: (1) the existence of an agreement between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by that defendant's breach. *See Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004); *Rexnord Holdings v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994).

A plaintiff "may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity." *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 215-16 (S.D.N.Y. 1997) (quoting *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*, 156 A.D.2d 550, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)). In other words, "absent a contractual relationship there can be no contractual remedy." *Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984).

While contract formation typically depends upon an express agreement between the parties, courts will also find a contract "implied in fact" based on "inference from the facts and circumstances of the case, . . . derived from the presumed intention of the parties as indicated by their conduct." *Leibowitz v. Cornell University*, 584 F.3d 487, 506-07 (2d Cir. 2009) (quoting *Jemzura v. Jemzura,* 36 N.Y.2d 496, 369 N.Y.S.2d 400, 330 N.E.2d 414, 420 (1975)). An implied-in-fact contract is "as binding as one that is express, and similarly 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Leibowitz*, 584 F.3d at 507 (quoting *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 699 N.Y.S.2d 716, 721 N.E.2d 966, 970 (1999)).

Although a non-party to a contract generally lacks standing to enforce that agreement, under New York law, a non-party may enforce a contract if the non-party was an intended third-party beneficiary of the agreement. *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir.

9

2005).  In order to assert a claim as a third-party beneficiary, a plaintiff must allege "(1) the

existence of a valid and binding contract between other parties, (2) that the contract was intended

for [the plaintiff's] benefit and (3) that the benefit to [the plaintiff] is sufficiently immediate,

rather than incidental, to indicate the assumption by the contracting parties of a duty to

compensate [the plaintiff] if the benefit is lost."  *Madeira v. Affordable Hous. Fund, Inc.*, 469

F.3d 219, 251 (2d Cir. 2006) (internal citation omitted).  *See Long Island Lighting Co.*, 728 F.2d

at 63 ("It is ancient law in New York that to succeed on a third party beneficiary theory, a non-

party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no

duty is owed.").

     The New York Court of Appeals has adopted the Restatement (Second) of Contracts

approach to third party beneficiary enforcement of contracts:

> Under New York law, a third party is an intended (as opposed to incidental)
> beneficiary of a contract if recognition of a right to performance in the beneficiary
> is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to
> pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the
> benefit of the promised performance.

*Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248-49 (2d Cir. 2002) (quoting Restatement

(Second) of Contracts § 302).  The New York Court of Appeals has explained that courts should

examine whether either (1) "no one other than the third party can recover if the promisor

breaches the contract," or (2) "the language of the contract otherwise clearly evidences an intent

to permit enforcement by the third party."  *Fourth Ocean Putnam Corp. v. Interstate Wrecking*

*Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208, 211-12 (1985)).  "Although a contractual

requirement that the promisor render performance directly to the third party may show an intent

to benefit the third party, contract language referring to third parties as necessary to assist the

parties in their performance does not by itself show an intent to render performance for the third party's benefit." *Travelers Cas. and Sur. Co. v. Dormitory Authority-State of New York*, 734 F. Supp. 2d 368, 377 (S.D.N.Y. 2010) (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.2d 119, 124, 126 (2d Cir. 2005)) (internal citations and quotation marks omitted).

### 2.    Application of Law to Facts

Plaintiff alleges that Defendant breached a contractual obligation to endorse and deliver the Bills of Lading to Plaintiff.  The Court holds that the Complaint fails to state a claim for breach of contract because it does not allege any valid contractual obligation that Defendant breached.

The Complaint does not allege that Plaintiff and Defendant are bound by any direct, written contractual relationship.  Defendant and Solo Vivo entered into the Fertilizer Contracts, but Plaintiff is not alleged to be a signatory to those agreements.  Plaintiff and Solo Vivo entered into the CFA, but Defendant is not alleged to be a signatory to that agreement.

Plaintiff alleges, instead, that Defendant, "by its prior course of conduct, and otherwise by its actions, expressly and/or impliedly agreed to *inter alia* immediately endorse and deliver the Bills of Lading" to Plaintiff.  Compl. ¶ 71.  Plaintiff also argues that, in the alternative, it was the intended third party beneficiary of an agreement between Defendant and Solo Vivo for Defendant to deliver the Bills of Ladings to Plaintiff.  *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Rule 12(b)(6) Motion for Partial Dismissal of the Amended Complaint (hereinafter "Pl. Opp.") at 17-19.[5]

---

[5] Plaintiff did not directly allege that it was a third-party beneficiary in the Complaint, but argues that the Complaint alleges the requisite elements for such a claim.  Pl. Opp. at 17.

Both arguments fail for the same reason.  Plaintiff has failed to allege the first element of a contract claim: an enforceable agreement to do what Plaintiff alleges Defendant has failed to do.

To support its implied contract argument, Plaintiff looks to the parties' alleged "prior course of conduct."  Compl. ¶ 71.  In particular, Plaintiff argues that the parties had engaged in a prior course of dealing whereby Solo Vivo "instructed" Defendant to deliver to Plaintiff the bills of lading in connection with the *Africa Falcon* and *Jullieta* shipments, and that Defendant thereby "was notified of and acknowledged all of the required steps to protect [Plaintiff's] secured interest in the goods financed."  Pl. Opp. at 15 (citing Compl. ¶¶ 32, 39, 40, 71).  Under Plaintiff's view, this amounted to a prior course of dealing that gave rise to a contractual obligation to deliver the Bills of Lading in connection with the transactions at issue here, once Defendant accepted payment from Plaintiff on the invoices for those transactions.  Pl. Opp. at 15.

This argument fails for several reasons.  First, as a general rule, a prior course of dealing in and of itself is not a source of future contractual obligation.  *See Cherry River Music Co. v. Simitar Entertainment, Inc.*, 38 F. Supp. 2d 310, 319 (S.D.N.Y. 1999) ("While industry custom and usage or a prior course of dealing between the parties is relevant to determining the meaning of a contract, it cannot create a contract where there has been no agreement between the parties"); *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 761 F. Supp. 1010, 1021 (S.D.N.Y. 1991) ("A prior course of dealing is a tool for interpreting existing contracts and may not be used to establish contract formation.") (internal citation omitted).  Second, Plaintiff does not allege a prior course of dealing that would even theoretically give rise to an enforceable obligation for Defendant to deliver the Bills of Lading to Plaintiff.  Contrary to the implication of Defendant's argument, the Complaint does not allege that Defendant <u>ever</u> delivered bills of lading to Plaintiff in the past.  As alleged in the Complaint, during both of the earlier

transactions, Defendant, in fact, delivered the bills of lading to Solo Vivo, and only because Plaintiff's representative "was informed of the transfer" and "was able to immediately obtain from Solo Vivo" the Bills of Lading did Plaintiff gain possession of them.  Compl. ¶¶ 21-22, 30-31.  Even if a prior course of dealing alone could give rise to a future obligation, it is not plausible to conclude that this particular course of dealing could support Plaintiff's "reliance" on the assumption that Defendant would deliver the Bills of Lading to Plaintiff in the transactions at issue.  Compl. ¶ 70.

Moreover, the Complaint is wholly devoid of any allegation of an actual obligation to deliver the Bills of Lading on Defendant's part.  In its opposition brief, Plaintiff repeatedly argues that Defendant acknowledged that it was "required" to endorse and deliver the Bills of Lading to Plaintiff as a condition of Plaintiff's payment of the relevant invoices as Solo Vivo's financier.  Pl. Opp. at 15, 16.  But the Complaint never alleges any such "requirement."  At most, Plaintiff has alleged that Solo Vivo "instructed" Defendant to deliver the Bills of Lading, and that Defendant "was notified of and acknowledged all of the required steps to protect [Plaintiff's] secured interest."  Compl. ¶ 32.  Under the Letter of Undertaking, Solo Vivo was allegedly required to "notify and instruct" Defendant to endorse and deliver the Bills of Lading to Plaintiff.  Compl. ¶ 38.  Even assuming that the allegations of the Complaint are true, and Solo Vivo did so instruct Defendant, Defendant never assented to, or agreed to be bound by, this "instruction." *See Leibowitz*, 584 F.3d at 507 (holding that an implied contract still requires mutual assent). The Court is not persuaded that an instruction by one party to another amounts to an enforceable promise on the part of the latter party.  This does not change simply because the instructed party "was notified of and acknowledged" the importance of the instruction to a third party.

Plaintiff points out that under New York law, in certain circumstances, silence can amount to an acceptance of a contract offer.  Pl. Opp. at 13-14 (citing, *inter alia*, *Textron, Inc. v.*

*Teleoperator Sys. Corp.*, 554 F. Supp. 315, 324 (E.D.N.Y. 1983)).  Although this is true, there is

no allegation of a specific, binding offer for Defendant to have silently accepted.  *Cf. Textron,*

*Inc.*, 554 F. Supp. at 324 (holding that written correspondence between parties, including

proposal, letter of intent, and purchase order, that, together, set out price, quantity, and time for

performance was "a contract that was sufficiently definite to be enforced").  When Defendant

accepted payment from Plaintiff, it was in fulfillment of Solo Vivo's obligations under the

Fertilizer Contracts.  This payment did not amount to an offer to enter into a new contractual

relationship with Plaintiff.  And Defendant's acceptance of payment did not create such a

relationship.

   Plaintiff's alternative argument, that it was the intended third party beneficiary of an

agreement between Defendant and Solo Vivo, fails for largely the same reasons.  The Complaint

does not allege the existence of an enforceable agreement between Defendant and Solo Vivo for

Plaintiff to enforce as third party beneficiary.  Defendant and Solo Vivo did enter into the

Fertilizer Contracts with one another, but those agreements do not mention Plaintiff, or even

what Solo Vivo's financing sources are or will be.  *See* Compl. ¶¶ 14, 23, 33; Monachino Aff.,

Exs. B-E.  Indeed, Plaintiff does not even attempt to argue that it is the intended third party

beneficiary of the Fertilizer Contracts themselves.  Instead, Plaintiff appears to argue that there

was a separate agreement between Defendant and Solo Vivo to the effect that "in consideration

of [Plaintiff's] payment of [Defendant's] invoices for the Goods represented by the Bills of

Lading, [Defendant] would endorse and deliver the Bills of Lading to [Plaintiff]."  Pl. Opp. at 17.

Plaintiff argues that "no party other than [Plaintiff] could benefit from an agreement between

[Defendant] and Solo Vivo that the Bills of Lading should be endorsed and delivered to

[Plaintiff]."  Pl. Opp. at 18.  This may well be true, but nowhere does the Complaint allege any

enforceable agreement to this effect between Defendant and Solo Vivo.  At most, Plaintiff must

14

fall back on the allegation that Solo Vivo "instructed" Defendant to deliver the Bills of Lading to Plaintiff. As previously explained, this instruction does not, as a matter of law, create a contract at all, let alone one that Plaintiff can enforce as an intended third party beneficiary.

In sum, the Complaint does not allege any enforceable contractual obligation for Defendant to deliver the Bills of Lading to Plaintiff. Defendant's motion to dismiss the breach of contract claim is thus GRANTED.

### B.   **Bailment Claim**

#### 1.   **Applicable Law**

##### a.   **Bailments**

Under New York Law, a bailment is defined as "a delivery of personal property for some particular purpose . . . upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be." *Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (quoting *Osborn v. Cline*, 263 N.Y. 434, 437, 189 N.E. 483 (1934)). Traditionally, a bailment requires (i) either actual or constructive delivery of personal property by the bailor to the bailee, and (ii) actual or constructive acceptance by the bailee. *See id*.

New York courts have also recognized a bailment relationship in "cases where there had been no delivery, either actual or constructive, as where one held the possession of a chattel under such circumstances that the law placed upon the person having the possession of the chattel the obligation to deliver it to another." *Wentworth v. Riggs*, 159 A.D. 899, 143 N.Y.S. 955, 956 (1st Dep't 1913). This type of bailment has been variously called a "constructive bailment," *Isik Jewelry v. Mars Media, Inc*., 418 F. Supp. 2d 112, 124-25 (E.D.N.Y. 2005), an "implied bailment," *id.* (quoting *Tremaroli v. Delta Airlines*, 117 Misc.2d 484, 485, 458

N.Y.S.2d 159 (N.Y. City Civ. Ct. 1983)), or a bailment "created by operation of law." *Martin v. Briggs*, 235 A.D.2d 192, 663 N.Y.S.2d 184, 187-88 (1st Dep't 1997) (quoting *Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946)).  A constructive bailment has been defined as follows.

> It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment, whether such possession results from contract or is otherwise lawfully obtained.  It makes no difference whether the thing be intrusted to a person by the owner or by another. Taking lawful possession without present intent to appropriate creates a bailment.

*Morgan Stanley & Co. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009) (quoting *Pivar v. Graduate School of Figurative Art of the New York Academy of Art*, 290 A.D.2d 212, 735 N.Y.S.2d 522, 524 (1st Dep't 2002) (citing *Foulke v. New York Consol. R.R. Co.*, 228 N.Y. 269, 127 N.E. 237, 239 (1920))).  A constructive bailment does not require the bailor's express assumption of a bailee's duties.  Courts have held that a constructive bailment "may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner."  *Martin*, 663 N.Y.S.2d at 187-88 (quoting *Phelps v. People*, 72 N.Y. 334, 358 (1878)).

An illustrative example of a constructive bailment is a railroad passenger leaving behind a package on the train.  The railroad company becomes the constructive bailee of the passenger as to the package, even though there was no actual bailment contract or direct delivery of the package from the passenger to the railroad company.  As the New York Court of Appeals explained, it is "the relationship between the owner, as passenger, and the railway, as common carrier, that g[ives] rise to the latter's duty to act as a gratuitous bailee of the property."  *People v. Wilson*, 93 N.Y.2d 222, 689 N.Y.S.2d 419, 226-27, 711 N.E.2d 633, 635 (1999) (explaining the reasoning behind *Foulke*, 127 N.E. 237).  Another typical scenario is "where one sells a

chattel to another, who pays the price thereof, and the vendor refuses to deliver it to the vendee."
*Wentworth*, 143 N.Y.S. at 956.  Given the vendor's duty to tender the chattel to its rightful buyer,
"the law implies the contract of bailment, and holds the vendor answerable as bailee."  *Id.*

### b.   Pledges

The validity of Plaintiff's bailment claim (as well as its conversion claim) depends, in
part, upon Plaintiff's superior right to possess the Bills of Lading and the underlying goods.
Because that right is grounded in Solo Vivo's alleged agreement to pledge those items to
Plaintiff, *see* Compl. ¶ 11, the Court reviews the law governing pledges of property as security.

Under New York common law, a valid pledge requires (1) an intent to pledge collateral
security on the part of the pledgor, and (2) the actual possession of the pledged collateral by the
pledgee.  *I&M Acquisition Corp. v. Wagner*, No. 95 Civ. 2114, 1995 WL 606353, at *6
(S.D.N.Y. Oct. 16, 1995) (citing *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir.
1976)).  It is a fundamental principle of New York common law that "there is no pledge without
delivery."  *McCoy v. Am. Express Co.*, 253 N.Y. 477, 171 N.E. 749, 751 (1930) (Cardozo, J.).
As the Court of Appeals has explained "[p]ossession is not changed by the promise of the owner
that he will hold the thing thereafter for the use of the pledgee.  Indeed, a pledge once
accomplished may be lost if the chattel is put back without restriction in the hands of the pledgor
. . . ."  *Id.* (internal citations omitted).

At common law, actual, physical possession by the pledgee himself is not strictly
necessary.  Rather, a court may find that a pledge was perfected if the collateral is in the
possession of a third party acting as the pledgee's agent.  *Id.* at 483.  This third party agent
cannot be the pledgor itself.  *See* 95 N.Y. Jur. 2d Secured Transactions § 66.

The New York Uniform Commercial Code ("UCC") governs certain secured
transactions, including some pledges.  Under the UCC, a security interest in negotiable

17

documents or goods is most straightforwardly perfected by the secured party "taking possession of the collateral." N.Y. U.C.C. § 9-313(a) (McKinney 2010). *See also id.* § 9-313(d) ("If perfection of a security interest depends upon possession of the collateral by a secured party, perfection occurs no earlier than the time the secured party takes possession and continues only while the secured party retains possession."). When the collateral is in possession of a person other than the debtor, the secured party constructively takes "possession" when "(1) the person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit; or (2) the person takes possession of the collateral after having authenticated a record acknowledging that it will hold possession of collateral for the secured party's benefit." *Id.* § 9-313(c). The UCC is clear that "[a] person in possession of collateral is not required to acknowledge that it holds possession for a secured party's benefit." *Id.* § 9-313(f). For a security interest in goods covered by a negotiable document, such as an order bill of lading, the UCC provides that a security interest in the goods may be perfected by perfecting a security interest in the document itself. *Id.* § 9-312(c).[6]

## 2.      Application of Law to Facts

In its Amended Complaint, Plaintiff alleges that Defendant, "by accepting payment in connection with [the invoices] and otherwise by its actions, assumed the status of a bailee with respect to the Bills of Lading and the cargo shipped under the Bills of Lading." Compl. ¶ 66. Defendant argues that Plaintiff has not alleged a bailment, because Plaintiff failed to allege either actual or constructive delivery of any property by Plaintiff to Defendant, or actual or constructive

---

[6] The UCC provides that "a . . . bill of lading . . . is negotiable (a) if by its terms the goods are to be delivered to bearer or to the order of a named person; or (b) where recognized in overseas trade, if it runs to a named person or assigns." N.Y. U.C.C. § 7-104(1) (McKinney 2010). The Bills of Lading here are consigned "to the order of Archer Daniels Midland Co." Monachino Aff., Exs. B-E. This allowed Defendant to endorse and negotiate the Bills of Lading to another party.

acceptance of any property by Defendant from Plaintiff.  Defendant further argues that Plaintiff can allege only an unperfected security interest in the Bills of Lading, created solely by agreements between Plaintiff and Solo Vivo, "the existence and contents of which [Defendant] is not alleged to have known."  Reply Memorandum of Law in Further Support of Defendant's Rule 12(b)(6) Motion for Partial Dismissal of the Amended Complaint at 3.

      Defendant is correct that the Complaint does not allege any actual delivery or acceptance, but Plaintiff argues that a constructive bailment was nevertheless created.  The basis for Plaintiff's theory is that, upon payment of the invoices, Plaintiff, by operation of the CFA, "became the rightful owner and holder of the Bills of Lading, with title to the cargo shipped under the Bills of Lading."  Compl. ¶ 65.[7]  Plaintiff alleges that Defendant "was advised of and had knowledge of this fact."  *Id.*  According to Plaintiff, its "superior right to possession of the Bills of Lading" created Defendant's "duty to account for the Bills of Lading and deliver them to [Plaintiff]."  Pl. Opp. at 10.  There is no dispute that Defendant possessed the Bills of Lading. The constructive bailment question thus turns on whether the Complaint has properly alleged Defendant's "duty to account" for the Bills of Lading as Plaintiff's property.  *Morgan Stanley*, 645 F. Supp. 2d at 256.

      Plaintiff argues that its superior right to possession, and Defendant's duty to account, arose from a combination of (1) Solo Vivo's pledge of the Bills of Lading to Plaintiff; (2) Plaintiff's payment of the invoices for the underlying goods to Defendant; (3) Defendant's receipt and acceptance of the payment; and (4) Solo Vivo's and Plaintiff's express instructions to Defendant to endorse and deliver the Bills of Lading to Plaintiff.  Pl. Opp. at 11.[8]

---

[7] Because the bills of lading were negotiable, the holder of the bill of lading would have the exclusive right to take possession of the underlying goods.

[8] Plaintiff argues further that its superior right to the Bills of Lading in turn also granted it a superior right to the underlying goods.

The flaw in Plaintiff's reasoning is that the Complaint does not adequately allege a superior right to possession of the Bills of Lading (or the goods) sufficient to convert Defendant into Plaintiff's bailee. The alleged superior possessory right derives from the allegation that "[p]ursuant to the Credit Facility agreement, Solo Vivo *agreed to pledge* to [Plaintiff] various forms of collateral and guarantees as security in such Inbound Products, including all Bills of Lading and other documents of title for the goods being financed." Compl. ¶ 11 (emphasis added). An "agree[ment] to pledge" property as collateral at some point in the future does not so alter the possessory and ownership rights in that property as to convert the current holder of that property into a bailee of the pledgee. *See McCoy*, 171 N.E. at 751.

The alleged pledge of the Bills of Lading could not have been perfected. There is no allegation that the Bills of Lading were ever in the actual possession of Plaintiff, and there is no allegation that Defendant, while holding the Bills of Lading, was Plaintiff's agent, or was acting on Plaintiff's behalf. Although the Complaint makes repeated references to Defendant "acknowledging" Plaintiff's security interest, these allegations are a far cry from the "authenticate[d] . . . record acknowledging that [Defendant] holds possession of the collateral for the secured party's benefit" required by the UCC. N.Y. U.C.C. § 9-313(c).[9]

---

[9] Plaintiffs argue that it is "well-established that a bailee need not consent or voluntarily assume the status of a bailee." Pl. Opp. at 9. This statement is contrary to current law. The case that Plaintiff cites to support this statement was referring in dicta to a holding of the Bankruptcy Court of Vermont. *See Weyerhauser Co. v. Israel Discount Bank of N.Y.*, 895 F. Supp. 636, 648 n.10 (S.D.N.Y. 1995) (citing *In re Housecraft Indus., USA, Inc.*, 155 B.R. 79, 89, 92 (Bankr. D. Vt. 1993)). That Vermont case was analyzing a provision of the Vermont UCC that is no longer in effect. In fact, the provision of the UCC discussed in that case – former section 9-305 – has been revised, and is now designated as section 9-113. Current Section 9-113 provides for the requirement that a third party in possession authenticate a record acknowledging that it holds possession of the collateral for the secured party's benefit. *Compare* Vt. Stat. Ann. tit. 9A, § 9-305 (1991) *with* Vt. Stat. Ann. tit. 9A, § 9-313 (2010). *See also* Vt. Stat. Ann. tit. 9A , § 9-313, comment 4 (2010) ("Former Section 9-305 permitted perfection of a security interest by notification to a bailee in possession of collateral. This Article distinguishes between goods in the possession of a bailee who has issued a document of title covering the goods and goods in the

Moreover, according to the allegations of the Complaint, Solo Vivo, at the time it entered into the agreement with Plaintiff, had neither possession of, nor title to, the Bills of Lading. Indeed, at the time Solo Vivo and Plaintiff entered into the CFA, the Bills of Lading did not even exist yet—they came into being only once the goods were shipped in August of 2007.  Compl. ¶ 33.  It is axiomatic that it is not possible to execute a pledge of property that does not exist. Under the terms of the Fertilizer Contracts, Solo Vivo did not itself obtain any right to the Bills of Lading (or the underlying goods) until after Defendant received payment on the invoices.  *See* Monachino Aff., Exs. B-E.  Solo Vivo was thus not in a position to execute an effective pledge of the Bills of Lading to Plaintiff at the time that it entered into the CFA.  At best, Solo Vivo could agree to pledge the Bills of Lading once it obtained title to (or possession of) them.  Thus, once Defendant received payment and Solo Vivo took title to the goods and Bills of Lading, Solo Vivo was presumably obligated to perfect its pledge by delivering the Bills of Lading to Plaintiff. But until Solo Vivo performed that obligation, Plaintiff did not have a superior right of possession that could be enforced against third parties, such as Defendant.

Plaintiff argues that the bailment was also created, in part, by virtue of Defendant's acceptance of payment from Plaintiff with knowledge of Plaintiff's security interest in the Bills of Lading.  As explained, *supra* Section III.A., the acceptance of payment in fulfillment of Solo Vivo's obligations under the Fertilizer Contracts did not create any kind of enforceable contractual agreement between Plaintiff and Defendant.  Cases where courts have found constructive bailments (absent delivery or acceptance or an express bailment agreement) have consistently involved a distinct source of obligation running between the putative bailee and

---

possession of a third party who has not issued a document. . . . Notification of a third person does not suffice to perfect under Section 9-313(c).").  New York has also adopted this change.  *See* N.Y. U.C.C. § 9-313 (McKinney 2010); *id.*, comment 4.  To whatever extent Plaintiff's statement was ever a correct statement of the law, it no longer is.

bailor.  For example, in the classic scenario found in *Foulke v. New York Consolidated R.R. Co.*, 127 N.E. 237, it was the railroad's duty as common carrier that created the bailment between it and the passenger.  *See Wilson*, 711 N.E.2d at 635.  In *Shmueli v. Corcoran Group*, 9 Misc.3d 589, 800 N.Y.S.2d 871 (N.Y. Sup. Ct. 2005), the court found a constructive bailment where a real estate broker who was terminated had maintained electronic and hard copy records of business contacts at her former place of work.  The court held that the real estate broker had "entrusted her client lists to [her former employer] for as long as they were affiliated in the real estate brokerage industry."  *Id.* at 597.  It was that relationship that created the employer's obligation as bailee to account for the lists as the plaintiff's property.  Here, there is no allegation that Defendant plausibly owed a comparable duty to Plaintiff.

There is no authority for the proposition that mere knowledge of an unperfected security interest in a piece of property is sufficient to confer on the holder of that property a duty to account for the property as a bailee.   Plaintiff argues the opposite, maintaining that "when a legal holder of property receives notice of a third party lender's security interest, the holder becomes legally accountable to [the] third party lender with respect to that interest, creating a constructive bailment between the holder and the third party lender."  Pl. Opp. at 10.  To support this assertion, Plaintiff cites to *AB Recur Finans v. Nordstern Insurance Company of North America*, 130 F. Supp. 2d 596 (S.D.N.Y. 2001), but Plaintiff mischaracterizes the holding of the case.  The court in *AB Recur* case did find a constructive bailment, but it did not arise from the mere notice of the third party lender's security interest.

In *AB Recur*, a buyer purchased a painting from a seller by borrowing $2 million from the plaintiff financier.  The buyer granted the financier a security interest in the painting in exchange for the financing.  The buyer stored the painting in a warehouse (insured by the defendant in the case).  The warehouse signed an agreement in which it acknowledged the financier's security

interest in the painting and agreed not to release the painting to any party, including the buyer, without the prior consent of the financier (the "Notification Agreement").  *Id.* at 598.  When the buyer defaulted on its loan payments, the seller (not having been paid) asked the warehouse to return the painting, which it did.  The warehouse did not inform the financier or obtain its consent before returning the painting to the seller.  The financier sued the warehouse for the value of the painting.  The court, in applying provisions of the warehouse's insurance policy, held that the Notification Agreement "effected a modification of the bailment contract" between the buyer and the warehouse.  *Id.* at 600.  The court held that "[w]hen [the warehouse] received notice of [the financier's] security interest, [the warehouse] became legally accountable to [the financier], with respect to that interest, creating a constructive bailment between it [and the financier]."  *Id.*  But as the context of the court's holding makes clear, it was not simply notice of a third party's security interest that imposed the obligation to that third party – it was the signing of a contract acknowledging the security interest and expressly promising to be accountable to that third party.

Here, the Complaint does allege that Defendant had notice of Plaintiff's security interest, *see* Compl. ¶ 54, but there is no allegation of any broader acknowledgment, or assumption, of a direct obligation running from Defendant to Plaintiff, as there was in *AB Recur*.  The Complaint alleges that Solo Vivo "instructed" Defendant to deliver the Bills of Lading to Plaintiff, but as explained, *supra* Section III.A., this did not create anything like the enforceable contractual obligation found in *AB Recur*.  Plaintiff does not cite to any case holding that mere notice of an unperfected security interest (without any other source of obligation running between the putative bailee and bailor) is enough to create a constructive bailment.

In sum, Plaintiff has not adequately alleged a bailment relationship between itself and Defendant as to the Bills of Lading, because it has not shown that it had a superior right to

possession of the Bills of Lading, nor has it identified a valid source of an obligation for

Defendant to be accountable to Plaintiff with regard to the Bills of Lading or the underlying

goods.  Thus, Defendant's motion to dismiss this claim is GRANTED.

     C.     <u>**Conversion Claim**</u>

          1.     **Applicable Law**

New York law defines conversion as "the unauthorized assumption and exercise of the

right of ownership over goods belonging to another to the exclusion of the owner's rights."

*Vigilant Ins. Co. of America v. Housing Authority of City of El Paso, Tex.*, 87 N.Y.2d 36, 637

N.Y.S.2d 342, 660 N.E.2d 1121, 1126 (1995) (citation omitted).  To maintain a claim for

conversion under New York law, "a plaintiff must show: (1) legal ownership or an immediate

superior right of possession to a specific identifiable thing and (2) that the defendant exercised an

unauthorized dominion over the thing in question, to the alteration of its condition or to the

exclusion of the plaintiff's rights."  *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d

191, 199 (S.D.N.Y. 2006) (quotation marks and citation omitted); *Phansalkar v. Andersen

Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001).

Although conversion is an intentional tort, a plaintiff need not allege that the defendant

had knowledge that he was acting wrongfully.  *LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir.

1997).  It is enough to show "an intent to exercise dominion or control over property in a manner

inconsistent with the rights of another."  *Id.*  When the original possession is lawful, "conversion

does not occur until the defendant refuses to return the property after demand or until he sooner

disposes of the property."  *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y.

2010) (citing *Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 53 (2d Cir.1993)).

Generally, only tangible property can be the subject of a conversion action, but intangible

rights can form the basis of conversion damages when the converted property is a document into

which intangible rights have merged.  *See In re Chateaugay Corp.*, 136 B.R. 79, 85-86 (Bankr. S.D.N.Y. 1992); Restatement (Second) of Torts, § 242.  For example, a bill of lading, which confers a right to possession of property being transported by ship, can be the subject of a conversion action.  *See In re Chateaugay*, 136 B.R. at 86 n.7; *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) (adjudicating suit by an instrumentality of the government of Cuba alleging conversion of bills of lading to sugar shipments).

> ## 2.      Application of Law to Facts

Plaintiff's conversion claim fails for much the same reasons as its bailment claim fails: the Complaint does not allege a superior right of possession on the part of Plaintiff.

In stating its claim for conversion, Plaintiff alleges that Defendant "took unauthorized assumption and exercise of the right of ownership over the Bills of Lading and the cargo shipped under the Bills of Lading, which were intended to provide security to [Plaintiff] for the amounts advanced by [Plaintiff] under the Credit Facility Agreement and the Letter of Undertaking."  Compl. ¶ 75.

The basis of Plaintiff's claim to a superior right to possession of the Bills of Lading (and the underlying goods) is the same as in its bailment claim: the allegation that the Bills of Lading were pledged as security in exchange for Plaintiff's financing of the transactions.  Pl. Opp. at 20 (citing Compl. ¶ 11).

An essential element of a proper claim for conversion is an "*immediate* superior right of possession."  *Command Cinema Corp.*, 464 F. Supp. 2d at 199 (emphasis added).  Here, the flaw in Plaintiff's argument is that it never had an "immediate superior right to possession."  Although Plaintiff had a security interest in the Bills of Lading, it was based only on Solo Vivo's unperformed "agree[ment] to pledge" them (once Solo Vivo gained the ability to do so).  As the New York Court of Appeals has explained, to maintain a conversion action, it is not enough for a

putative pledgee to allege "that he may have been entitled to an equitable lien which by a judgment of a court of equity could be specifically enforced." *McCoy*, 171 N.E. at 750. *See also Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003) (noting that "a conversion action cannot be predicated on an equitable interest or a mere breach of contractual obligation").

Plaintiff never perfected the pledge through obtaining actual or constructive possession. This unperfected security interest was not sufficient to render the then-current holder of the Bills of Ladings (*i.e.*, Defendant) liable for conversion for failing to endorse and deliver the Bills of Lading to Plaintiff. As alleged in the Complaint, Plaintiff had a mere equitable right to obtain the Bills of Lading from Solo Vivo, pursuant to the CFA. This is not enough to support a conversion claim against Defendant.

The motion to dismiss the claim for conversion is thus GRANTED.

## IV.    **Conclusion**

For the reasons stated above, Defendant's Motion for Partial Dismissal of the Amended Complaint (Dckt. No. 69) is granted in its entirety, without prejudice. Briefing and discovery regarding the remaining Brazilian law claim, including briefing and discovery regarding choice-of-law issues, will be set at the conference scheduled for March 9, 2011.

SO ORDERED.

Dated: New York, New York
       March 8, 2011

Kimba M. Wood
United States District Judge

26