UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANCILE INVESTMENT COMPANY
LIMITED,
                        Plaintiff,

                                                                                             08 CV 9492 (KMW)
          -against-                                                     Opinion & Order

ARCHER DANIELS MIDLAND COMPANY,
                        Defendant.
------------------------------------------------------------X
WOOD, U.S.D.J.:

        Plaintiff Ancile Investment Company ("Ancile"), pursuant to an Amended Complaint ("Complaint") (Dkt. No. 68), brings this action against Archer Daniels Midland Company ("ADM"). Ancile's claims are based on ADM's failure to endorse and deliver to Ancile two bills of lading in connection with Ancile's financing of the sale of fertilizer materials by ADM.

        The Complaint alleges one claim under Brazilian law and three claims under New York state law. On March 8, 2011, this Court granted ADM's motion to dismiss the New York state law claims. (Dkt. No. 79). On August 3, 2011, this Court denied ADM's motion for an order determining that Ancile's remaining Brazilian law claim is governed by Illinois law, held that Brazilian law applied to the claim, and denied ADM's motion to dismiss. (Dkt. No. 93). As a result, all that remains of the Complaint is Ancile's Brazilian law claim. ADM now moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss this remaining claim. (Dkt. No. 102). For the reasons that follow, ADM's motion to dismiss is GRANTED.

I.        BACKGROUND

        The procedural history and factual background of this case are more fully reviewed in the Court's previous opinions in this matter. See Ancile Inv. Co. v. Archer Daniels Midland Co.,

2011 WL 3516128 (S.D.N.Y. Aug. 3, 2011) (Wood, J.) (Dkt. No. 93); Ancile Inv. Co. v. Archer Daniels Midland Co., 784 F. Supp. 2d 296 (S.D.N.Y. 2011) (Wood, J.) (Dkt. No. 79); Ancile Inv. Co. v. Archer Daniels Midland Co., 2009 WL 3049604 (S.D.N.Y. Sept. 23, 2009) (Crotty, J.) (Dkt. No. 47).  The following summary is drawn from Ancile's Complaint, and is accepted as true for purposes of ADM's motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### A. Basic Allegations

Ancile, a foreign corporation with its principal place of business in the Cayman Islands, entered into a Credit Facility Agreement ("CFA") with Solo Vivo Industria E Commercio De Fertilizantes LTDA ("Solo Vivo"), under which Ancile agreed to finance Solo Vivo's import and export business by issuing short term loans to Solo Vivo.  See Compl. ¶¶ 7-8.  ADM, a domestic corporation with a place of business in the Southern District of New York, entered into contracts with Solo Vivo under which ADM agreed to sell Solo Vivo various raw materials used to produce fertilizer.  Id. ¶¶ 14, 23, 33.

Ancile's loaned Solo Vivo the funds to finance its purchases from ADM.  Id. ¶¶ 15, 24, 38.  Ancile agreed to advance approximately 83.33% of the invoice amounts, with Solo Vivo responsible for the remainder.  Id. ¶ 10.  In exchange for Ancile's financing, Solo Vivo agreed to provide Ancile with security interests in the imported materials pending repayment, including "all Bills of Lading and other documents of title for the goods being financed."  Id. ¶ 11.  A bill of lading is "an acknowledgment by a carrier that it has received the goods for shipment," which, if negotiated (as in this case), "controls possession of the goods."  Royal & Sun Alliance Ins. v. Ocean World Lines, Inc., 612 F.3d 138, 141 n.3 (2d Cir. 2010); Ancile, 784 F. Supp. 2d at 299.

As this Court noted in its earlier opinion, Ancile's Complaint boils down to the following basic allegation:

> In exchange for [Ancile]'s financing of Solo Vivo's purchases of fertilizer materials from [ADM], Solo Vivo "instructed" [ADM] to deliver to [Ancile] the bills of lading for each shipment of goods as security for the financing. Those bills of lading served as the documents of title to the goods shipped. When [ADM] failed to do this, and Solo Vivo defaulted on its payment obligations, [Ancile] was left unpaid, with no way to enforce its security interest in the goods.

Ancile, 784 F. Supp. 2d at 299 (footnoted omitted) (citing Compl. ¶ 55).

### B. History of Relevant Transactions

To understand the shipments that gave rise to the allegations in the Complaint, Ancile argues that the Court must also consider certain prior transactions. In particular, Ancile focuses on shipments made by ADM aboard the *African Falcon* and the *Jullieta*. Solo Vivo instructed ADM that when ADM received payment from Ancile, ADM should endorse the bill of lading from the *African Falcon* shipment to the order of Ancile and deliver it to Ancile. See Compl. ¶¶ 14, 16-17. ADM, however, had previously endorsed the bill of lading "in blank" (meaning whoever had possession of the bill of lading had title to the goods) and, upon receiving payment from Ancile, delivered the bill of lading to Solo Vivo. Id. ¶¶ 18, 21. When Ancile's representative learned of the transfer, it immediately obtained the bill of lading from Solo Vivo and had Solo Vivo endorse the bill "to the order of Ancile." Id. ¶ 22. The bill of lading for the *Jullieta* shipment was endorsed following the same pattern. See id. ¶¶ 23-31.

Ancile's claims arise out of ADM's actions regarding shipments carried aboard the *Calypso* and the *Abkhazia*. According to the Complaint, Solo Vivo, pursuant to a "Letter of Undertaking" with Ancile, "agreed and undertook to notify and instruct" ADM to endorse and deliver two bills of Lading to Ancile—Bill of Lading No. 10 and Bill of Lading No. PGU-04—relating to materials transported aboard the *Calypso* and the *Abkhazia*, respectively. See id. ¶¶ 34, 35, 38. After Ancile paid ADM, ADM did not deliver the bills of lading to Ancile, but rather to Solo Vivo—just as it had with the *African Falcon* and *Julieta* shipments. See id. ¶¶ 40, 44,

3

51-54. In the *Calypso* and the *Abkhazia* transactions, however, Ancile was unable to obtain the bills of lading from Solo Vivo. Thus, once Solo Vivo disposed of the goods, Ancile could not enforce its security interest after Solo Vivo defaulted on its repayment. See id. ¶¶ 49, 52, 55. Ancile now looks to ADM to recover these payments, claiming that ADM's failure to deliver the bills of lading violated ADM's "duty of good faith."

## II.  LEGAL STANDARDS

### A.  Motion to Determine Foreign Law Standard

In this motion, ADM, pursuant to Federal Rule of Civil Procedure 44.1, seeks a determination of the content of Brazilian law as is relevant to the Complaint. "Determination of a foreign country's law is an issue of law." Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 92 (2d Cir. 1998). Under Rule 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Although a court may "enlist the parties in th[e] effort" to determine foreign law, "[u]ltimately, the responsibility for correctly identifying and applying foreign law rests with the court." Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard Co., 426 F.3d 580, 586 (2d Cir. 2005).

In the Second Circuit, a claim resting on the existence or application of foreign law will be dismissed if the party advancing the claim fails to provide evidence of the contents of the foreign law. See, e.g., Eli Lilly do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 84 (2d Cir. 2007) (refusing to apply Brazilian law where party relying on Brazilian law provided "no real support in the record" for its understanding); Esso Standard Oil S.A. v. S.S. Gasbras Sul, 387 F.2d 573, 581 (2d Cir.1967) (dismissing claims after finding plaintiff failed to carry its burden to prove strict liability existed under Guatemalan law).

B.   **Motion to Dismiss Standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A plaintiff's claim is plausible when the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must "accept as true all well-pleaded factual allegations in the Complaint and . . . draw all reasonable inferences in favor of the plaintiff." S.E.C. v. Apuzzo, 689 F.3d 204, 207 (2d Cir. 2012). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

III.   **ANALYSIS**

Ancile argues that the Complaint states two plausible bases of relief: First, Ancile argues that ADM's actions violated the duty of good faith that Brazilian law imposes on extra-contractual commercial relationships. Second, Ancile argues that the Complaint states a claim for relief because Ancile was subrogated to Solo Vivo's rights against ADM. The Court concludes that neither of these arguments states a claim upon which relief can be granted.

A.   **Extra-Contractual Duty of Good Faith**

Ancile does not (and cannot) argue that ADM's conduct violated any direct contractual agreement or duty. See Ancile, 784 F. Supp. 2d at 304 (finding absence of any contractual relationship between ADM and Ancile). Nor can Ancile argue that ADM's actions were inconsistent with a prior course of dealing. See id. at 305 ("The Complaint does not allege that [ADM] *ever* delivered bills of lading to [Ancile] in the past. . . . [D]uring both of the earlier transactions, [ADM], in fact, delivered the bills of lading to Solo Vivo, and only because

5

[Ancile]'s representative was informed of the transfer and was able to immediately obtain from Solo Vivo the Bills of Lading did [Ancile] gain possession of them. . . . [I]t is not plausible to conclude that this particular course of dealing could support [Ancile]'s reliance on the assumption that [ADM] would deliver the Bills of Lading to [Ancile] in the transactions at issue." (citations and quotation marks omitted)). Accordingly, Ancile is left to argue that ADM's actions violated an extra-contractual duty of good faith that ADM owed Ancile.

On behalf of Ancile, Professor Fabio Ulhoa Coelho argues that by failing to deliver the bills of lading to Ancile, ADM violated the duty of good faith imposed by Brazilian law on all business relationships, even non-contractual ones. See Legal Op. of Professor Fabio Ulhoa Coelho ¶¶ 22, 25-28, 61 (Dkt. No. 107, Ex. 1) ("Coelho Op."); see also Ancile's Br. Regarding the Duty of Good Faith under Brazilian Law (Dkt. No. 106) ("Ancile's Duty of Good Faith Br."); Ancile's Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt. No. 109) ("Ancile's Mem."). Professor Judith Martins-Costa, on behalf of ADM, agrees that Brazilian law imposes a duty of good faith in certain situations, but contends that Brazilian law does not impose any extra-contractual duty of good faith on Ancile and ADM's relationship. See Legal Op. of Professor Judith Martins-Costa ¶¶ 21, 51 (Dkt. No. 105) ("Martins-Costa Op."); see also ADM's Mem. in Supp. Mot. to Dismiss (Dkt. No. 104) ("ADM's Mem."); ADM's Reply Mem. in Supp. Mot. to Dismiss (Dkt. No. 115) ("ADM's Reply").[1] The dispute between the Parties and their experts thus boils down to the question of whether Brazilian law imposes an extra-contractual duty of good faith on non-contracting parties involved in an international commercial transaction. The

---

[1] The Court appreciates both experts' attempts to clarify these difficult questions of Brazilian law and ultimately gives little weight to the Parties' attempts to disparage the experts' credentials. See, e.g., ADM's Mem. at 7, 8; Ancile's Mem. at 18. Moreover, both Parties claim that the opposing expert's opinion is based on erroneous understandings of the facts. See ADM's Mem. at 18; Ancile's Mem. at 19. These distinctions are immaterial. Both experts clearly understood that Ancile and Solo Vivo entered into a financing relationship. Both experts likewise understood that while Ancile paid ADM from Ancile's own accounts, the payments related to Solo Vivo's debts arising out of transactions between Solo Vivo and ADM. Ultimately, the Court concludes that the experts' supposed misunderstandings are insufficient to warrant discrediting the whole of either expert's opinion.

Court concurs with ADM's assessment of Brazilian law and determines that, in the context of the international commercial transactions at issue in this case, there existed no extra-contractual duty of good faith that ADM might plausibly have violated.

Both Parties agree that a tort or "illicit act" under Brazilian law occurs when a person, "by voluntary act or omission, negligence or imprudence, violates rights and causes damage to another." BCC Art. 186. Moreover, a tort also occurs when the "holder of a right, . . . in exercising it, . . . manifestly exceeds the limits imposed . . . by good faith or by good conduct." BCC Art. 187.[2] Professor Coelho, on behalf of Ancile, interprets Article 187's "good faith" requirement to extend to all commercial relationships, even on non-contractual ones. To support this interpretation, Professor Coelho analogizes to Article 422, which requires "contracting parties . . . to observe the principles of probity and good faith, both in entering into the contract and in its performance." BCC Art. 422. Coelho suggests that Article 422, although explicitly applicable only to parties in a contractual relationship, "provides the framework for Brazilian courts to analyze the general duty of good faith . . . [applicable to] non-contractual business relationships." Coelho Op. ¶ 31.

Article 422 clearly applies to contractual relationships. Article 422's duty of good faith extends to *pre-contractual* business relationships as well. This limited extension, however, is hardly sufficient to convince the Court that a similar obligation of good faith applies to a non-contractual relationship, such as the relationship between Ancile and ADM.[3] See Martins-Costa

---

[2] Unless otherwise noted, the Court relies on the translations of the Brazilian Civil Code ("Brazil CC") as provided to the Court by Ancile. See Pincus Decl., Ex. 5 (translation from Leslie Rose, The Brazilian Civil Code in English (2008)) (Dkt. No. 107).

[3] The Parties have cited, and the Court has found, various examples of the application of the duty of good faith in the context of contractual relationships. In one case, where a party "remained silent regarding acceptance of the arbitration clause yet actively participated in the arbitration and thus generated a confidence between the parties regarding an intent to arbitrate," the Brazilian Superior Court of Justice applied the principle of good faith and interpreted the silence to manifest consent. Luiz Gustavo & Meira Moser, Arbitration Clause and Acceptance: The Role of Silence and Fair Dealing in *L'Aiglon S.A. v. Textil Uniao S.A.* – A Brazilian Experience, 11 VINDOBONA J.

Op. ¶¶ 57, 57.1-.5 (arguing that Article 422 does not apply to this case).  Article 422's location in the Special Part of the Brazilian Civil Code relating to the Law of Obligations, which includes contract and quasi-contract law, rather than in the General Part, which applies to a broader range of relationships, suggests that Article 422 should not be read as a standard of conduct applicable to *all* (even non-contractual) legal relationships.  See Martins-Costa Op. ¶ 57.5.  Accordingly, the Court finds Ancile's analogy to Article 422 unconvincing.

      Professor Coelho also argues that judicial precedent supports his interpretation of the Brazilian duty of good faith.  Professor Coelho first cites two decisions which, although applying principles of good faith, involve the interpretation of *contractual* relationships and therefore provide little guidance to this case.  See Carlos Jose Bahi Martins v. Edmundo Amissi Garcia, Court of Justice of Bahia, 4th Civil Court, Civil Appeal No. 61780-6/2008 (May 15, 2009) (applying principles of good faith to interpret contractual clause involving tax payments on real property); Francisco Bermal Caparroz v. Joaquim Fernandes Sobrinho, S.T.J., Appeal No. 95539-SP (Oct. 14, 1996) (refusing to rescind sale of real property where sales contract had not yet been signed but parties had previously acknowledged the existence and viability of the contract).  The remaining decisions cited by Professor Coelho are too removed from the factual situation at hand to provide guidance.  See Alfa do Sul Cartao de Credito Ltda. v. Banco Bamerindus do Brazil, S.T.J., Appeal No. 2003.000696-6/0000-00 (Oct. 9, 2007) (holding that attorney-partner could not, in good faith, claim lack of knowledge regarding the actions of the associates she supervised, whom she had entrusted with signing authority on behalf of the company); National Treasury v. Reni Gottardo, S.T.J., Appeal No. 1.143.216 (April 9, 2010)

---

INT'L COMM. LAW & ARB. 305, 309 (2007); see also José Carlos Moreira da Silva Filho, The Human Person and Objective Good Faith in Contract Relations, 25 PENN ST. INT'L L. REV. 405, 429 (2006) ("The principle of objective good faith has been applied in two different ways, first, as a limitation on the assertion of rights by one party to the contract, and second, as a source of new obligations in the contractual relation.").  The complete dearth of analogous case law in the non-contractual good faith context, when considered in light of the relatively robust case law in the contractual context, supports the Court's rejection of Ancile's argument.

(determining that the Treasury's receipt of a taxpayer's payments for over four years required that the Treasury, in good faith, excuse certain administrative failures on the taxpayer's part).[4]

In fact, Ancile admits, as it must, that no precedent exists for its position regarding the duties that good faith places on extra-contractual commercial transactions. See Ancile's Mem. at 20. Lack of judicial precedent is a weakness in Ancile's argument, given that judicial precedent plays an important role in Brazilian law. See Coelho Dep. 65:17–66:8 (Dkt. No. 103, Ex. D) (noting use of Brazilian case law in "illustrating arguments"); Martins-Costa Op. ¶¶ 16.2-.4, 17 ("[J]udicial precedents are important—and increasingly more important—in Brazilian law."); see also Tanya Katerí Hernández, To Be Brown in Brazil: Education and Segregation Latin American Style, 29 N.Y.U. REV. L. & SOC. CHANGE 683, 706 (2005) ("'[C]ase law plays a much greater role in the evolutionary process of legal development in Brazil than elsewhere in the civil law world' with the use of a quasi-precedential device called the 'súmula.'" (quoting [I Brazil] Thomas H. Reynolds & Arturo A. Flores, Foreign Law: Current Sources of Codes and Basic Legislation in Jurisdictions of the World 6 (1989 & 8/2004 Release))).

Ancile's sole support for its interpretation of Brazilian law is Professor Coelho's opinion. Although this Court respects Professor Coelho's analysis, courts frequently "caution[] against undue reliance on the testimony of experts in determining foreign law." In re Tyson, 433 B.R. 68, 79 n.15 (S.D.N.Y. 2010) (Cote, J.); see also Bodum USA, Inc. v. La Cafetiere, Inc., 621 F.3d 624, 629 (7th Cir. 2010) ("Trying to establish foreign law through experts' declarations . . . adds an adversary's spin, which the court then must discount."); Sunstar, Inc. v. Alberto–Culver Co., 586 F.3d 487, 495-96 (7th Cir. 2009) (noting foreign law experts are often "selected on the basis of the convergence of their views with the litigating position of the client or their willingness to fall in with the views urged upon them by the client"); United States v. Mitchell, 985 F.2d 1275,

---

[4] English translations of these cases are attached to Professor Coelho's Opinion. (Dkt. No. 107, Ex. 1.)

1280 (4th Cir. 1993) ("Not surprisingly, th[e Parties'] affidavits and letters present conflicting views of the interpretation of the [Pakistani statute and constitution] and fail to establish, to this court's satisfaction, a definitive answer as to the official Pakistani interpretation of the laws.").

Beyond Professor Coelho's own opinion, the Court has found no support for Ancile's argument regarding the extra-contractual duty of good faith under Brazilian law. Accordingly, in the context of the international commercial transactions at issue in this case, the Court finds no extra-contractual duty of good faith that ADM might plausibly have violated. See Eli Lilly, 502 F.3d at 84 ("In the absence of [evidence of contrary foreign law], we are comfortable concluding that our own firmly grounded policy of enforcing contractual obligations assumed by sophisticated commercial entities should apply."); Martins-Costa Op. ¶ 56.3.2 ("[T]he principle of good faith must coexist with the principles of free enterprise and reliance in trade usage . . .").

### B. Third-Party Payment & Subrogation

As an alternative to its good faith argument, Ancile argues that the Complaint states a claim for relief because Ancile was subrogated to Solo Vivo's rights against ADM. Subrogation is the "substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary (9th ed. 2009). Ancile asserts that when ADM accepted Ancile's payment, Ancile became subrogated to Solo Vivo's rights against ADM, and thus "step[ped] into the shoes of the original creditor . . . and succeeding to all rights of the original creditor against the debtor." Ancile's Mem. at 9-11; see also BCC Art. 346 (Subrogation occurs when "an interested third party . . . pays a debt for which he is or could be obligated, in whole or in part."). As a result of this subrogation, when Ancile paid Solo Vivo's debt to ADM, ADM had "no further need for the security documents in connection with the underlying transaction" and, "acting in good faith

10

(and duly instructed by [Solo Vivo)]," should have delivered the bills of lading to Ancile so that Ancile could avail itself of its rights against Solo Vivo.  See Ancile's Mem. at 10.

Contrary to Ancile's assertions, however, the Court finds that the facts alleged do not result in subrogation under Brazilian law.  Under Brazilian law, subrogation by agreement occurs: "I – when the creditor receives payment from a third party and *expressly transfers* to him all his rights;" or "II – when a third party loans the debtor the sum necessary to acquit the debt, on the *express condition* that the lender shall be subrogated in the rights of the satisfied creditor." BCC Art. 347 (emphasis added).  Ancile recognizes that subrogation occurs pursuant to an "express agreement," but then is unable to cite any such express agreement in this case.  See Ancile's Mem. at 9; see also Martins-Costa Supp. Decl. ¶ 5 (noting lack of express subrogation agreement in this case); ADM's Reply at 4 (same).

The CFA does not state any intention that Ancile be subrogated to Solo Vivo.  In its Complaint, Ancile accurately describes the CFA as "provid[ing] for Ancile to make short term loans to Solo Vivo . . . for the purpose of financing Solo Vivo's import and export of goods by ocean vessels."  Compl. ¶ 8; see also Monachino Supp. Decl., Exs. Q, R (commercial invoices lacking subrogation language).  Without more, Ancile's agreement to pay 83.33% of the amount Solo Vivo owed on various commercial transactions does not amount to a subrogation agreement.[5]

---

[5] To support its position, Ancile cites a work by ADM's expert, Professor Martins-Costa.  See Ancile's Mem. at 8-9 (citing Judith Martins-Costa, Comentários Ao Novo Código Civil 344 (2006)).  In reply, Professor Martins-Costa persuasively demonstrates that Ancile's argument is based on a mistranslation.  See Martins-Costa Supp. Decl. ¶¶ 7-12 (Dkt. No. 116, Ex. O).  Accordingly, the Court finds unpersuasive Ancile's argument, under Article 321, that ADM owed a "discharge obligation" to deliver the bills of lading to Ancile.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Determination of Foreign Law and to Dismiss the Amended Complaint (Dkt. No. 102) is GRANTED, with prejudice. The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

Dated: New York, New York
       November 29, 2012

                                                 Kimba M. Wood
                                                 United States District Judge